# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:14-cr-278 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| LARUN MILLER, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Defendant Larun Miller moves to suppress certain statements made by him during a police interrogation on June 3, 2014. (Doc. No. 20 ["Mot"].) Specifically, defendant seeks to suppress all statements made by him after he alleges that he made a clear and unequivocal request that the interrogation cease. The government opposes the motion. (Doc. No. 28 ["Opp'n."].) The Court conducted an evidentiary hearing on the motion on May 1, 2015. At the conclusion of the hearing, the Court took the matter under advisement.

## I. BACKGROUND

On June 2, 2014, law enforcement learned that defendant, a registered sex offender, was not living at his registered address. The following day (June 3, 2014), members of the United States Marshals Service and local law enforcement arrested defendant at his workplace and transported him to the Wickliffe Police Department. Once at the police station, defendant was placed in an interview room where he was read his *Miranda* rights. There is no dispute that, following a reading of his rights, defendant

knowingly and voluntarily signed a form specifically waiving his right to remain silent and agreed to speak with officers. The interrogation that followed was conducted by Deputy United States Marshal ("DUSM") William Boldin and Fugitive Task Force Officer ("TFO") Don Dondrea. The interview was recorded by audio and video, and the Court had the opportunity to review the recording before the evidentiary hearing on May 1, 2015.[1] (Doc. No. 22 ["Interview CD"]; Def. Hearing Ex. 1.)

Early in the interrogation, the officers and defendant established a procedure whereby defendant would provide responses to questions he was willing to answer, and would advise the officers if he was refusing to answer any particular question that was put to him. In situations where defendant was unwilling to provide an answer, defendant would say so, and the officers would move on to another topic. For example, when officers questioned defendant about a cell phone he placed in his car when law enforcement arrived at his workplace, Miller indicated that he did not want to answer questions on this topic:

>DUSM Boldin: Why wouldn't you tell us about that phone?
>
>Miller: I just chose not to.
>
>DUSM Boldin: You just chose not to? OK that's fine.
>
>                             \*\*\*
>Miller: OK can I ask you a favor? . . . I need to write my bank card number down because direct deposit will be going out in the morning.
>
>                             \*\*\*
>DUSM Boldin: We'll work on that. Let me ask you a question. The phone that's in your car, what's the number to that phone?

---

[1] It appears from the recording that defendant was not restrained, in any way, during the interview, and was free to, and did, move about the interview room.

2

>Miller: I'd prefer not to give it to you.
>
>DUSM Boldin: You'd prefer not to give it to us?
>
>TFO Dondrea: C'mon, here's the deal. You want us to help you with your girlfriend, your motel, and your bank card.
>
>Miller: I mean I been—
>
>TFO Dondrea: We're gonna work on that, but you gotta help us out here.
>
>Miller: I mean, I've been honest with you—
>
>TFO Dondrea: Yes you have.
>
>Miller: I mean, I'm not, I'm not gonna—ok you just said it a while ago, you'd rather me say no than to lie to you.
>
>TFO Dondra: Yeah, I agree with that, but now then you're asking us for favors so, I mean—we're glad to help you out, whatever happened, happened, but you gotta be, I mean, we'll do favors for you but we don't have to.
>
>Miller: I know you don't have to. That's the reason I asked the question. Ya'll ask questions and I'm not blowing smoke up either ya'll's asses, and I'm not going to. I'm either not gonna answer the question, or I'm gonna answer it.

After indicating that he did not provide the cell phone number to his parole officer because he was "in enough trouble already[,]" Miller stated that he would reconsider—at a later time—whether he would give the officers the number. The officers then moved on to a different topic.

Defendant does not deny that he initially agreed to speak with law enforcement, nor that he and the interviewing officers had an informal agreement regarding the handling of questions defendant was unwilling to answer. Moreover, he does not dispute that there was a certain give and take to the interview, inasmuch as

3

defendant was requesting certain favors from the officers, relating to his bank account and other personal matters, and, in return, the officers were seeking information relative to the crimes at issue in this case. Still, defendant claims that he eventually reconsidered his decision to speak with the officers, and that he unequivocally reasserted his right to remain silent. Because the interviewing officers purportedly did not scrupulously honor his request to cease the interview, defendant argues that all of the statements that followed must be suppressed.

## II.  GOVERNING LAW AND DISCUSSION

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. Under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), "[p]rior to any questioning [by law enforcement], the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." A defendant may knowingly and voluntarily waive his right to remain silent, and even may, if he chooses, "selectively waive his Fifth Amendment rights by indicating that he will respond to some questions, but not to others." *United States v. Lorenzo*, 570 F.2d 294, 297-98 (9th Cir. 1978); *see United States v. Jumper*, 497 F.3d 699, 704 (7th Cir. 2007) (noting that the right to remain silent applies to a defendant's refusal to answer selective questions, and collecting cases, including *United States v. Williams*, 665 F.2d 107, 109 (6th Cir. 1981)); *see, e.g., United States v. Hurst*, 228 F.3d 751, 759 (6th Cir. 2000) (defendant had agreed to speak with officers but had refused to answer questions regarding stolen firearms).

Even after a defendant has validly waived his right to remain silent, if he, at any point during the interrogation, indicates that he does not wish to be interviewed, the interrogation must cease. *Miranda*, 384 U.S. at 444-45. "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id*. at 445 "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (quoting *Miranda*, 384 U.S. 474, 479.)

"[N]o ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination." *Emspak v. United States*, 349 U.S. 190, 194, 75 S. Ct. 687, 99 L. Ed. 997 (1955); *see McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir. 2001) (citation omitted). Nonetheless, the request to "cut off questioning" must be unambiguous. *See Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). "'[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel,' then police are not required to cease questioning." *Bird v. Brigano*, 295 F. App'x 36, 38 (6th Cir. 2008) (quoting *Davis*, 512 U.S. at 459).

The inquiry into whether the defendant unambiguously invoked his right to remain silent is an "objective" one. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) ("A requirement of unambiguous invocation of

5

*Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity.") (quoting *Davis*, 512 U.S. at 458-59). In performing this objective inquiry, the Sixth Circuit has instructed district courts to carefully consider the surrounding circumstances. *Bird*, 295 F. App'x at 38. For instance, in *Bird*, the defendant identified two instances during an interrogation where he maintained that he had unequivocally invoked his right to remain silent.

> The first incident occurred about a half an hour into the interrogation, when Bird stated that 'there's no sense me sitting here trying to say what happened with me . . . because as usual, when it comes to Derrick Bird, he's guilty.' He then stood up, saying, 'You take me in; get booked, man.' The detectives told him to sit back down. Bird then continued to answer questions. The second incident occurred sometime later, when a third detective entered the room and told him: 'This is your chance to talk about it. You [sic] been talking about it [to others].' Bird replied: "Everything's right there in the paper. I'm done talking about it.'

*Id*. After examining the surrounding circumstances, the court found that defendant had not unequivocally invoked his *Miranda* rights.

> Bird argues that his standing up, especially when coupled with his later statement that he was 'done talking about it,' could be viewed as an invocation of his right to silence. And taken in isolation, out of context, that is not an unreasonable conclusion. But context matters. When Bird stood up and talked about getting taken in (despite already being at the police station) the state court was not unreasonable in finding that his actions did not amount to an 'unambiguous' request for counsel. As the district court observed, this could reasonably be interpreted as simply an act of frustration, not an attempt to end the interview.

*Id*.

"Thus, this Court must decide whether [d]efendant asserted his right to remain silent with sufficient clarity that a reasonable officer would perceive it as such under the circumstances. In making this determination, the Court is required to consider

6

the context in which the supposed assertion was made." *United States v. Johnson*, No. 1:11-cr-49, 2011 WL 2604774, at *3 (W.D. Mich. June 30, 2011) (citing *Bird*, 295 F. App'x at 38); *see Franklin v. Bradshaw*, 545 F.3d 409, 414 (6th Cir. 2008) ("a suspect must assert his right to remain silent with sufficient clarity that a reasonable officer would perceive it as such under the circumstances") (citations omitted); *see also Texas v. Cobb*, 532 U.S. 162, 176, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001) (Kennedy, J., concurring) ("Where a required *Miranda* warning has been given," a suspect's incriminating statement "is suppressed to protect the Fifth Amendment right of silence only if a reasonable officer should have been certain that the suspect expressed the unequivocal election of the right.")

The first instance where defendant claims that he invoked his right to counsel occurred approximately one hour into the interview, when officers steered their questioning to a Yahoo! email account.

TFO Dondrea: Who is Run6868?

Miller: I don't have no clue.

TFO Dondrea: You don't have no clue?

Miller: No.

TFO Dondrea: Remember what we talked about how you have to uh—

Miller: Be honest.

TFO Dondrea: Be honest.

Miller: I prefer not to answer the question.

TFO Dondrea: Right let me just explain something here. Just like when he told you when we asked you where you lived and you said you didn't want to answer it, and then he told you you were staying at the Value Inn—

7

> Miller: Ya'll know everything. I'm sure you do. I'm gonna—
>
> TFO Dondrea: And there are some things we know—
>
> Miller: *I gon' prefer not to answer any more questions then*. I mean—
>
> TFO Dondrea: OK, um—
>
> DUSM Boldin: Alright, I mean, like I said, you can roll the dice and see what this stonewalling does but—but you know what if you can explain something it's a lot better than just what the evidence is.
>
> Miller: OK. Well, before we go any further can I go use the bathroom?

Miller then was permitted to take a brief restroom break. Prior to exiting the interview room, defendant indicated that he would "give [] strong consideration" to answering more questions. When he returned from the restroom, defendant continued to answer questions.

Defendant suggests that any reasonable officer would have understood his comment that he would "*prefer not to answer any more questions then*" to be a clear and unequivocal reassertion of his *Miranda* rights, and, perhaps, in isolation such a statement could reasonably be construed as an invocation of defendant's rights. When the comment is placed in the context of the interview, however, a different conclusion is warranted for several reasons. First, defendant's response to the question regarding the email account did not stray far from the responses he had given in other instances where he had chosen to not answer a particular question (i.e., "I prefer not to answer the question"; "I just chose not to," "I'd prefer not to give it to you.") Second, a review of the video and audio recording confirms that he delivered his response in the same calm, collected, and matter-of-fact manner in which defendant had selectively refused to

8

answer certain questions in the past. Additionally, defendant asked if he could go to the bathroom, "before we go any further," assured the officers that he would give "strong consideration" to continuing to answer questions, and did, indeed, answer further questions upon his return. Finally, the addition of the word "then" at the end of the defendant statement is, in itself, equivocal and appears to suggest a qualified statement relative to his willingness to proceed. These facts suggest that defendant was not treating the interview as "over,." and the Court finds that all of these circumstances, together, could have lead a reasonable officer to conclude that defendant was not cutting off the interview, but was simply wrestling with whether he should answer questions relating to the email account.[2] *See, e.g., United States v. White*, 53 F. Supp. 3d 1101, 1109 (N.D. Ind. 2014) (defendant's statement that he did not "have to say anything" was not an invocation of his right to remain silent where defendant's behavior and mannerisms did not change after making the response, and he "evidenced an intent to continue the interrogation").

However, it is evident from the recording that the tone and tenor of the interview eventually changed. As the officers continued to push defendant for answers regarding the email account, defendant became increasingly reticent to speak. After admitting that he had "made a mistake" in response to questions regarding a girl named "Jordan," defendant stated: "I can only say this. I can't talk anymore, I really can't. I mean, right now I feel like I'm just on the edge . . . I can't comment any further." After officers continued to question him regarding Jordan, defendant repeated: "Please don't

---

[2] At the evidentiary hearing, DUSM Boldin testified that he did not believe that defendant was refusing to answer any more question, but, rather, that the officers had simply touched upon an uncomfortable subject.

push me over the edge, please." By this point in the interview, defendant's demeanor had changed to one of severe agitation, as defendant made a personal plea to DUSM Boldin—"Bill please, no more, listen now, no more please, right now. Really, please. No more right now." Nonetheless, the questioning continued, even after defendant indicated that "[t]he discussion is closed" in response to a question regarding an individual who allegedly shared the email account.

The Court finds that there came a point in the interview where any reasonable officer would have recognized that defendant was attempting to cut off the interrogation. Defendant's repeated pleas that the questioning stop, coupled with the change in his demeanor and his stated belief that officers had pushed him to "the edge," lead the Court to the inevitable conclusion that the officers failed to "scrupulously honor" defendant's requests to cut off the questioning. *See, e.g., Jumper*, 497 F.3d at 706 (finding that there came a point in the interview where defendant's vague refusal to answer certain questions turned to a clear invocation of the right to remain silent). Under these circumstances, the Court finds that defendant unambiguously invoked his right to remain silent at 10:04:08, and any statements he made after that point shall be suppressed.

### III. CONCLUSION

Accordingly, defendant's motion to suppress (Doc. No. 20) is GRANTED in part and DENIED in part as set forth above.

**IT IS SO ORDERED**.

Dated: June 4, 2015

                                                **HONORABLE SARA LIOI**
                                                **UNITED STATES DISTRICT JUDGE**